IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRADLEY ACALEY, individually and on behalf of all others similarly situated,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>VIMEO, INC.,  )<br>)<br>Defendant.  ) | Case No. 19 C 7164 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Bradley Acaley has sued Vimeo, Inc., alleging that a mobile application Vimeo owns and operates violated the Illinois Biometric Information Privacy Act (BIPA), 740 Ill. Comp. Stat. 14/15, by using face-geometry scan technology. Vimeo has filed a motion asking the Court to stay the lawsuit and compel individual arbitration of Acaley's claim. For the reasons stated below, the Court denies Vimeo's motion.

### Background

The following facts are undisputed except where otherwise noted. Vimeo owns and operates Magisto, a web and mobile application (app) that allows its users to create videos using their own and stock video clips and images.[1] People can sign up to use Magisto's services in two ways: by creating an account using Magisto's mobile app

---

[1] Vimeo acquired Magisto and related assets from the app's creator, Magisto, Inc., in May 2019. In connection with the acquisition, Magisto, Inc., assigned all user agreements to Vimeo.

(available for download from Apple and Google's app stores) or through a web browser on the Magisto.com website. The basic services are free to download and use, but users can purchase subscription plans that offer additional features.

At some point on or before March 24, 2018, Acaley, using an iPad, downloaded the Magisto app from Apple's app store. At the time, the store's page for the app displayed the address of a website with Magisto's terms of service and privacy policy.

On March 24, 2018, Acaley used the app to sign up for a free trial of one of Magisto's subscription plans. To sign up, he opened the app and accessed its welcome page, which showed a blue button reading "Continue with Facebook" and, below that, text reading "More options." Def.'s Mem. in Support of Mot. to Stay and Compel Indiv. Arb., Ex. A (Dagan Decl.) ¶ 11. Just below the words "More options" there was smaller-font text stating, "By continuing I agree to **the terms**." *Id.* The word "terms" appeared in bold type, as indicated, *id.*, and it contained a hyperlink to Magisto's terms of service.

Acaley clicked on "More options." *Id.* ¶ 12. He was presented with a window with a heading that read, "Continue with." *Id.* Below the heading, appeared these options: "Facebook," "Google," "Email," or "Explore as a guest." *Id.* Though Magisto's welcome page was visible in the background, the window entirely covered the aforementioned hyperlink to the terms of service.

Acaley chose the e-mail option. A pop-up modal window appeared with three more options: "Join Now," "Log In," or "Cancel." *Id.* ¶ 13. In the background, Magisto's welcome page, including the hyperlink to its terms of service, still was visible but appeared in dimmer colors than before. There is no evidence indicating that a user could click on the terms of service with the pop-up window open.

From there, Acaley signed up for a Magisto account. It is unclear from the record before the Court whether he had access to or indicated his acceptance of the terms of service while completing the sign-up process.

After signing up, Acaley was presented with a page asking how he planned to use Magisto. The page contained no mention of the terms of service. Acaley indicated that he planned to use Magisto primarily for business-related videos.

Acaley then was shown a screen with an offer for a free trial of a subscription plan that appears to have been geared toward business professionals. There was a button that said, "Start your trial" and, immediately below that, in smaller text, the words "SUBSCRIPTION DETAILS & TERMS" and a drop-down arrow. *Id.* ¶ 14. Clicking on the drop-down arrow would have extended the page to display additional text and a hyperlink to Magisto's terms of service. No evidence indicates that Acaley clicked on the drop-down arrow. It is undisputed that he clicked on the "Start your trial" button. *Id.* There was no language expressly indicating that clicking "Start your trial" constituted an acceptance of the terms of service. *Id.*

The next day, on March 25, 2018, Acaley bought an upgraded subscription plan. To purchase it, he visited a page on the app regarding upgrades and selected a button that read, "Buy now." *Id.* at 16. As with the free-trial screen, the page showed, in smaller font, the text "SUBSCRIPTION DETAILS & TERMS" and a drop-down arrow that would extend the page and display a hyperlink to the terms of service. *Id.* ¶¶ 16–17. Again, there was no language expressly indicating that upgrading the plan constituted an acceptance of the terms of service.

On April 10, 2018, Acaley created a free Magisto account on his iPad using a

web browser, not the app. To do so, he accessed a webpage with a heading that read, "Join Magisto today!" *Id.* ¶ 19. Below the heading appeared buttons with Facebook and Google's logos. Below that, there was a form to create an account by entering a name, e-mail address, and password, followed by a button labeled, "Create account." *Id.* Directly below that button, in smaller font, text said, "By starting you agree to our terms and privacy policy." *Id.* The words "terms" and "privacy policy" were highlighted in a different color from the other words in the phrase and contained hyperlinks to Magisto's terms of service and privacy policy, respectively. Acaley clicked on button with Facebook's logo and signed up for a Magisto account using his Facebook account.

Over the next few months, Acaley twice used the app to switch to different subscription plans that presumably offered different features. On April 26, 2018, he switched to a downgraded subscription plan. On June 8, 2018, he switched to an upgraded subscription plan. Each time he switched plans and/or bought a new type of plan, he encountered a page with the drop-down feature that, as described, if clicked would have provided him with a hyperlink to the terms of service. It is not clear from the evidence, however, whether Acaley actually viewed or accessed Magisto's terms of service at any point in time.

The terms of service contained a clause entitled "Binding Arbitration," which stated in relevant part as follows:

> You and Magisto agree that, except as provided below, all disputes, controversies and claims related to these Terms (each a "Claim"), shall be finally and exclusively resolved by binding arbitration, which may be initiated by either party by sending a written notice requesting arbitration to the other party.

4

Dagan Decl., Ex. 1 at 20.[2]

The terms of service also contained a clause entitled "Exceptions to Arbitration," which stated as follows:

> You and Magisto agree that the following Claims are not subject to the above provisions concerning negotiations and binding arbitration: (a) any Claim seeking to enforce or protect, or concerning the validity of, any of your or Magisto's intellectual property rights; (b) any Claim related to, or arising from, allegations of theft, piracy, invasion of privacy or unauthorized use; and (c) any claim for equitable relief. In addition to the foregoing, either party may assert an individual action in small claims court for Claims that are within the scope of such court's jurisdiction in lieu of arbitration.

*Id.* at 21.

In October 2019, Acaley filed this lawsuit on behalf of himself and a putative class, alleging that Vimeo violated BIPA, 740 Ill. Comp. Stat. 14/15. BIPA sets out requirements for the retention, collection, use, and disclosure of biometric identifiers or information by private entities. *See id.* As defined by the statute, a biometric identifier is "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." *Id.* § 10. Biometric information is "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id. See id.* § 15.

Acaley has asserted a single claim against Vimeo. Specifically, he has alleged that Vimeo violated BIPA by using facial recognition technology to scan, collect, and store his and other users' face geometries from videos and photographs they uploaded

---

[2] Vimeo has offered two versions of Magisto's terms of service: one that was in effect from October 2017 until May 2018 and one that was in effect from May 2018 until July 2018. Because all of the clauses relevant to this opinion are identical in both versions, the Court cites only to the former version. *Compare, e.g.*, Dagan Decl., Ex. 1 at 20 *with* Dagan Decl., Ex. 2 at 20.

5

to Magisto without satisfying the statute's requirements. Vimeo has moved to stay the litigation of Acaley's claims and to compel arbitration of those claims on an individual basis.

## Discussion

The Federal Arbitration Act "provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (citing 9 U.S.C. §§ 3, 4). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *William Charles Constr. Co. v. Teamsters Local Union 627*, 827 F.3d 672, 679 (7th Cir. 2016) (quoting *AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 648 (1986)). To that end, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Gore v. Alltel Commc'ns*, LLC, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

Vimeo asks the Court to stay the proceedings in this case and compel individual arbitration because, it contends, Acaley and Magisto made an enforceable agreement to arbitrate, and the scope of the arbitration clause in that agreement covers Acaley's claim. In response, Acaley asks the Court to deny Vimeo's motion and also to rule that an appeal of that denial would be frivolous and unlikely to succeed.

**A.    Formation**

As an initial matter, the parties dispute whether they formed an agreement to

arbitrate. A question of whether an agreement to arbitrate has been formed is governed by state law. *Gore*, 666 F.3d at 1032. Magisto's terms of service contained a clause stating that the terms are governed by California law. Despite this, both parties primarily rely on cases applying Illinois law. In a footnote midway through its brief, however, Acaley contends that California law is substantively different from Illinois law because it prohibits a plaintiff from waiving his rights to class arbitration of a claim for public injunctive relief. Pl.'s Resp. Mem. at 11 n.9. The rule to which Acaley refers holds that "[a]greements to arbitrate claims for public injunctive relief" under three particular California consumer-protection statutes "are not enforceable in California." *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 953, 393 P.3d 85, 88 (2017). This does not apply to Illinois's BIPA statute. Because neither party contends that there is any substantive difference between the *relevant* governing standards in Illinois and California, the Court need not perform a choice-of-law analysis and will apply the law of Illinois, the forum state. *See Gorny v. Wayfair Inc.*, No. 18 C 8259, 2019 WL 2409595, at \*5 (N.D. Ill. June 7, 2019) (Kennelly, J.) (citing *Nationwide Advantage Mortg. Co. v. GSF Mortg. Corp.*, 827 F.3d 577, 580 (7th Cir. 2016); *Johnson v. Uber Techs., Inc.*, No. 16 C 5468, 2018 WL 4503938, at \*3 (N.D. Ill. Sept. 20, 2018)).

The Court turns to the question of whether the parties formed an agreement to arbitrate. The parties do not dispute that Magisto's terms of service contained an arbitration clause, but they dispute whether Acaley assented to the terms of service. "Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016). In determining whether a user

7

has received reasonable notice, courts "ask whether the web pages presented to [the user] adequately communicate[d] all the terms and conditions of the agreement, and whether the circumstances support the assumption that the [user] receive[d] reasonable notice of those terms." *Id.* at 1034. "This is a fact-intensive inquiry." *Id.* at 1034–35.

Courts "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." *Id.* at 1035. Thus "[w]here the terms are not displayed but must be brought up by using a hyperlink, courts . . . have looked for a clear prompt directing the user to read them." *Id.* at 1036; *see, e.g.*, *Johnson*, 2018 WL 4503938, at *1 (agreement formed where purchase page conspicuously included the following language: "[b]y creating an [] account, you agree to the Terms of Service & Privacy Policy.").

For example, in *Sgorous*, the Seventh Circuit found that a plaintiff did not assent to a service agreement that included an arbitration clause when he purchased a consumer credit score online and the "web pages on which [he] completed his purchase contained no clear statement that his purchase was subject to *any* terms and conditions of sale." *Sgouros*, 817 F.3d at 1035. The court stated that the thing that "cinche[d] the case" for the plaintiff was "the fact that [the defendant's] site actively [misled] the customer" by indicating that he was authorizing the defendant "to obtain his personal information" without saying anything "about contractual terms." *Id.* It concluded that no reasonable person would think that clicking on the box to give his personal information constituted acceptance of a service agreement. *Id.*

By contrast, in *Hubbert v. Dell Corp.*, 359 Ill. App. 976, 835 N.E.2d 113 (2005)—a

case that also involved an online purchase and that the Seventh Circuit has found to be instructive, *Sgouros*, 817 F.3d at 1035—"numerous" webpages comprising a five-step purchase process showed a blue hyperlink with the relevant terms and conditions. *Hubbert*, 359 Ill. App. at 983, 835 N.E.2d at 121. Notably, three of those webpages also featured a statement indicating that "[a]ll sales are subject to [the company's] Term[s] and Conditions of Sale." *Id.* at 984, 835 N.E.2d at 121–22. The Illinois Appellate Court found that the statement and the hyperlinks together were sufficient to "place a reasonable person on notice that there were terms and conditions attached to the purchase." *Id.* at 984, 835 N.E.2d at 122.

In this case, Acaley received reasonable notice on at least two occasions that his use of the Magisto app constituted assent to its terms of service. First, he received such notice when he initially opened the app and viewed its welcome page, where, as indicated, the following statement appeared: "By continuing I agree to **the terms**." Dagan Decl. ¶ 11. This statement, like the one that appeared on several webpages in *Hubbert*, would place a reasonable person on notice that there were terms and conditions connected to his or her continued use of the app. In addition, Acaley received reasonable notice that he was assenting to Magisto's terms of service when he signed up for the free subscription plan trial via a web browser on his iPad. As indicated, he accessed a webpage that featured a button with the text "Create account" and, directly below that, in smaller but still conspicuous font, displayed a statement that read: "By starting you agree to our terms and privacy policy," with hyperlinks to the respective documents. *Id.* ¶ 19. That statement would put a reasonable person on notice that there were terms and conditions connected to the creating an account.

9

Acaley contends that the language used in these statements was confusing and did not make clear that a person who took the actions he took was subject to Magisto's terms of service. Specifically, with regard to the app's welcome page, he asserts that the statement "By continuing I agree to the terms" mirrored the language only of the "Continue with Facebook" button, not of the "More options" hyperlink that he clicked. *See id.* ¶ 11. He contends a person in his shoes would not have understood that clicking the hyperlink constituted assent to the terms. But though the language certainly could have been more precise, a reasonable person would have understood that the "More options" hyperlink provided more options for continuing to use the app and that continued use of any sort amounted to assent to the terms of service. This understanding immediately would have been confirmed by the window that appeared after a person clicked "More options": its heading read, "Continue with" and, directly below that, it listed several ways that a person could continue to use the app. *Id.* ¶ 12. Unlike in *Sgouros*, where the defendant's website actively misled a customer by saying *nothing* about contractual terms, Magisto's app reasonably gave notice that, by continuing to use the app to sign up for an account, a user assented to its terms.

Acaley makes a similar argument with regard to Magisto's website, which indicated that "starting" to use the Magisto program would trigger a user's acceptance of the terms of service. *See id.* ¶ 19. He asserts that, due to the website's inexact language, someone in his shoes would not have known that clicking the button to create an account with Facebook constituted "starting" to use the program and thus accepting the terms. See *id.* That contention also stretches too far. A reasonable person would understand that the word "starting" referred to the creation of an account—indeed, there

10

appears to have been no way to start using the Magisto from that page without creating an account—and that by using Facebook to create an account he or she was accepting the terms of service.

Acaley also argues that Magisto's presentation of the terms of service on the app was confusing. Specifically, he contends that, at certain stages of the sign-up process on the app, users either could not view the hyperlink to the terms of service or could not click on it. In addition, he contends that the pages for starting free trials of Magisto's subscription plans, purchasing those plans, or switching between plans did not make clear that users were agreeing to the terms. Acaley is correct that these pages did not make clear the existence of the agreements. On the app, the hyperlink was not visible on at least two pages in the sign-up process. And though the pages on the app concerning the subscription plans had language reading "SUBSCRIPTION DETAILS & TERMS" with drop-down arrow that displayed, among other things, a hyperlink to Magisto's terms of service, the pages did not affirmatively inform users that they were assenting to the terms of use. *E.g.*, *id.* ¶ 14. But a website or app can give users reasonable notice of an agreement even if it does not provide an affirmative statement giving such notice on every page. *See Hubbert*, 359 Ill. App. at 983–84, 835 N.E.2d at 121–22 (of "numerous" webpages, only three featured an affirmative statement that all sales were subject to those terms and conditions). And, as just explained, a reasonable person would have realized when viewing the statement on the *first* page of the app that his or her continued use of the app constituted assent to the terms. Thus by the time a user viewed the subsequent pages Acaley contends are problematic, he or she had already been provided reasonable notice and assented to the terms of use.

11

Acaley finally contends that the agreement between him and Magisto amount to a so-called browsewrap agreement and therefore is unenforceable. The terms and conditions of a browsewrap agreement generally are posted "on a website via a hyperlink at the bottom of the screen," whereas a clickwrap agreement is formed after a user is presented with the terms and conditions and click an "'I agree' box." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *see also TopstepTrader, LLC v. OneUp Trader, LLC*, No. 17 C 4412, 2018 WL 1859040, at *3 (N.D. Ill. Apr. 18, 2018). The characterization of an agreement as clickwrap or browsewrap is not dispositive, however; what matters is whether the website and app provided users with reasonable notice that their use constituted assent to the terms. *See Sgouros*, 817 F.3d at 1036. As explained above, Magisto provided users with such notice.

Because Magisto provided reasonable notice of its terms of service to users of its app and people who signed up for its accounts and subscription plans, the Court concludes that Acaley and Magisto made an agreement to arbitrate.

**B. Scope**

The next question is whether Acaley's BIPA claim falls within the scope of the parties' agreement to arbitrate. "To determine whether a contract's arbitration clause applies to a given dispute," a federal court applies "state-law principles of contract formation." *Gore*, 666 F.3d at 1032. In doing so, a court must be "mindful that both the law and public policy strongly favor arbitration." *Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014). If the court finds the contract "provides for arbitration of some issues between [the parties], any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as

a matter of federal law." *Gore*, 666 F.3d at 1032. A court should compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 314 (2010). As indicated earlier, however, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *William Charles Constr.*, 827 F.3d at 679 (quoting *AT&T Techs.*, 475 U.S. at 648).

The parties dispute whether the arbitration clause covers Acaley's BIPA claim. As indicated, in the terms of service, the parties agreed that "all disputes, controversies and claims related to" the terms would be "finally and exclusively resolved by binding arbitration, which may be initiated by either party by sending a written notice requesting arbitration to the other party." Dagan Decl., Ex. 1 at 20. The agreement contained an "Exceptions to Arbitration" clause, which stated:

> You and Magisto agree that the following Claims are not subject to the above provisions concerning negotiations and binding arbitration: (a) any Claim seeking to enforce or protect, or concerning the validity of, any of your or Magisto's intellectual property rights; (b) any Claim related to, or arising from, allegations of theft, piracy, invasion of privacy or unauthorized use; and (c) any claim for equitable relief. In addition to the foregoing, either party may assert an individual action in small claims court for Claims that are within the scope of such court's jurisdiction in lieu of arbitration.

*Id*. at 21.

In its opening brief, Vimeo contended that the arbitration clause covered a wide range of claims, including Acaley's at-issue claim, without addressing the agreement's exceptions. In response, Acaley asserted that the claim he brought under BIPA plainly relates to or arises from an invasion of privacy and thus, under the agreement, is

13

excepted from arbitration. In its reply brief, Vimeo did not dispute the contention that the agreement excludes invasion-of-privacy claims. Instead, it disputed whether Acaley's BIPA claim is among those excluded.

Vimeo does not appear to dispute the contention that BIPA claims generally relate to or arise from invasion of privacy, however. Nor could it. The Illinois Supreme Court has described the Illinois General Assembly as codifying in BIPA the principle that "individuals possess a *right to privacy* in and control over their biometric identifiers and biometric information," and it has found that a violation of BIPA "constitutes an *invasion*, impairment, or denial of the statutory rights of any person" subjected to the violation. *Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186, ¶ 33, 129 N.E.3d 1197, 1206 (emphasis added). Federal district courts, including this Court, also have described the Illinois legislature as creating a "legal right to privacy" in BIPA and have characterized lawsuits brought under BIPA as "[i]nvasion of privacy lawsuits." *Dixon v. Washington & Jane Smith Cmty.–Beverly*, No. 17 C 8033, 2018 WL 2445292, at *9 (N.D. Ill. May 31, 2018) (Kennelly, J.); *see also Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 953–54 (N.D. Cal. 2018).

Instead, Vimeo argues that the "Exceptions to Arbitration" clause is susceptible of at least two interpretations that cover Acaley's claim and thus the Court should compel arbitration. *See Granite Rock Co.*, 561 U.S. at 314. First, Vimeo contends the clause can be interpreted as providing that only invasion-of-privacy claims brought by Vimeo are excepted from arbitration, not such claims brought by users. In addition, Vimeo contends the exception can be interpreted as covering only common-law tort claims of invasion of privacy, not other sorts of invasion-of-privacy claims. The Court

14

addresses each contention in turn.

### 1. Claims brought by users

Vimeo contends that "[w]hen the parties wanted to cover or exempt claims asserted by users, they did so expressly." Def.'s Reply Mem. at 7. It contends that the parties did not expressly exempt from arbitration invasion-of-privacy claims brought by users and thus that the agreement can be read as exempting only such claims if brought by Vimeo.

This is not a tenable reading of the exception, which on its face clearly covers "any" claim related to or arising from an invasion of privacy. *See Gore*, 666 F.3d at 1033 (under Illinois law, "[w]here [a] contract's language is plain, the agreement should be enforced as written"). The text of the "Binding Arbitration" clause does not distinguish between "claims asserted by either party," as Vimeo contends. *See* Def.'s Reply Mem. at 7 (internal quotation marks omitted); Dagan Decl., Ex. 1 at 20. It merely states that *binding arbitration* "may be initiated by either party." *Id.* And the "Exceptions to Arbitration" clause does not distinguish between claims according to which party can assert them, either. *See id.* at 21. Rather, the terms used in the agreement to describe the claims excepted from arbitration—"any," "related to," and "arising from," *id.*—are "extremely broad and capable of an expansive reach." *Gore*, 666 F.3d at 1034 (interpreting similar terms in an arbitration clause); *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999) (same). Nothing in the agreement indicates that they should not be interpreted broadly and expansively.

For these reasons, the "Exceptions to Arbitration" clause cannot reasonably be read as excepting from arbitration claims related to invasion of privacy only if they are

15

brought by Vimeo. And though Vimeo contends this renders superfluous references to the separate parties in the "Binding Arbitration" and "Exception to Arbitrations," that is incorrect. Those references cannot be superfluous because, as just explained, nothing in the agreement indicates that the parties expressly, or even implicitly, distinguished between claims brought by the different parties.

**2. Common-law tort**

Vimeo next argues that the terms of service should be read as excepting from arbitration only claims asserting the common-law tort of invasion of privacy, not other types of claims such as those brought under BIPA. This argument falls flat. The agreement states that "any Claim related to, or arising from, allegations of . . . invasion of privacy" is excepted from arbitration. Dagan Decl., Ex. 1 at 21. This language plainly cannot be read as excepting only common-law invasion of privacy claims from arbitration; to read it as such would make the phrases "related to" and "arising from" superfluous. *See*, *e.g.*, *Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1060 (7th Cir. 2018) (courts generally avoid interpreting statutes in ways that render words superfluous).

Vimeo contends, however, that that the phrase "invasion of privacy" should be interpreted narrowly because the "word 'invasion' bespeaks an aggressive, even extreme act that far exceeds mere non-compliance with regulatory law." Def.'s Reply Mem. at 9. As just explained, such an interpretation would run contrary to the agreement's plain text. And, as described earlier in this opinion, courts, including the Illinois Supreme Court, have used the word "invasion" to describe BIPA violations. *E.g.*, *Rosenbach*, 2019 IL 123186, ¶ 33, 129 N.E.3d at 1206.

16

Vimeo also contends that the exception for claims relating to invasion of privacy may be interpreted as involving only the corresponding common-law tort because other unlawful acts mentioned in relevant subpart—"theft" and "piracy"—amount to "highly abusive," "criminal," and "egregious misconduct." Def.'s Reply Mem. at 9–10. This contention also misses the mark. It appears to be based in part on a faulty assumption that an invasion of privacy under BIPA is not as harmful as theft or piracy. *Cf. Rosenbach*, 2019 IL 123186, ¶ 34, 129 N.E.3d at 1206 (rejecting characterization of BIPA violations as "merely technical in nature" and stating that BIPA's procedural protections prevent against "real and significant" injuries (internal quotation marks omitted)). And Vimeo's characterization of the other claims described in the subpart as criminal does not help its case that the clause can be interpreted as involving only the common-law tort; a common-law invasion of privacy, like a BIPA violation, does not constitute criminal misconduct.

Vimeo then tries out an argument grounded in legal context. It contends that the standard meaning of "invasion of privacy" refers only to the corresponding common-law tort and that the terms of service should be interpreted accordingly. But it does not cite any cases suggesting this is the standard meaning of "invasion of privacy." Instead, it cites a number of cases involving the interpretation of insurance policies. Def.'s Reply Mem. at 10–11 (citing *Ace Am. Ins. Co. v. RC2 Corp.*, 600 F.3d 763, 766 (7th Cir. 2010); *Glob. NAPs, Inc. v. Fed. Ins. Co.*, 336 F.3d 59, 62 (1st Cir. 2003); *Great Am. Ins. Co. v. Riso, Inc.*, No. CIV.A. 04-12260-GAO, 2006 WL 4158730, at *4 (D. Mass. Mar. 31, 2006), *aff'd*, 479 F.3d 158 (1st Cir. 2007); *Spiegel v. Zurich Ins. Co.*, 293 Ill. App. 3d 129, 133, 687 N.E.2d 1099, 1101 (1997)). This case does not involve an insurance

policy, so principles about how to interpret those policies are not binding here. Rather, the "[m]ost important" considerations for the Court in interpreting contracts under Illinois law are the parties' objective manifestations, including the language they used in the contract. *Gore*, 666 F.3d at 1033. And nothing in the language of the terms of service objectively indicates that the phrase "claim related to, or arising from, allegations of . . . invasion of privacy" references only claims asserting the common-law tort of invasion of privacy, not other types of claims related to invasion of privacy.

Vimeo contends that Illinois courts routinely distinguish between claims involving common-law invasion of privacy torts and those involving BIPA for statute of limitations purposes. This contention, like the others Vimeo makes, falls short. Nothing in the language of the terms of service indicates that the parties intended to define the types of claims excepted from arbitration in relation to the applicable statutes of limitations.

For these reasons, the Court concludes that the "Exceptions to Arbitration" clause is not susceptible of the interpretation that it excepts only claims asserting the common-law tort of invasion of privacy and not other types of claims related to or arising from invasion of privacy.

In sum, the Court concludes, "with positive assurance," that the relevant clauses in the terms of service are not susceptible of a reading that the parties' agreement to arbitrate covers Acaley's BIPA claim. *See Granite Rock Co.*, 561 U.S. at 314. As a result, the claim is not within the scope of the parties' agreement to arbitrate.[3]

---

[3] In addition to asserting that his BIPA claim is expressly excepted from arbitration, Acaley separately contends that his request for equitable relief is expressly excepted from arbitration by the terms of the agreement. The Court need not address separately, however, whether Acaley's request for equitable relief is covered by the agreement, because he sought such relief as part his BIPA claim. See 740 Ill. Comp. Stat. 14/20

**C.     Appeal**

As indicated, Acaley not only asks the Court to deny Vimeo's motion but also "to rule that an appeal of the Motion would be [] frivolous and unlikely to succeed." Pl.'s Resp. Mem. at 17. He "suspects" that, if the Court rules in his favor on the present motion, Vimeo will appeal the order and delay the progress of the litigation between the parties. *Id.* But a court can rule only on matters that are before it. Accordingly, Acaley's request is premature.

## Conclusion

For the foregoing reasons, the Court denies Vimeo's motion to stay this case and compel arbitration [dkt. no. 15] and directs Vimeo to answer the complaint by no later than June 23, 2020. The case is set for a status hearing, to be conducted by telephone, on June 29, 2020 at 9:45 a.m. A joint status report, including an agreed proposed discovery and pretrial schedule or alternative proposals, is to be filed by June 22, 2020.

                                                                        _____
                                                                                    MATTHEW F. KENNELLY
                                                                                    United States District Judge

Date:  June 1, 2020

---

(injunctive and other equitable relief is available under BIPA). Regardless, the agreement plainly states that "any claim for equitable relief" is excepted from arbitration. Dagan Decl., Ex. 1 at 21.